UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

REGINALD MCGILL,

Plaintiff,

v.

THE CITY OF ROCHESTER and TREVOR JONES,

Defendants.

**DECISION AND ORDER**

6:22-CV-06523 EAW

## INTRODUCTION

On August 2, 2021, Rochester Police Department ("RPD") officer Trevor Jones ("Jones") shot and killed plaintiff Reginald McGill's ("Plaintiff") dog, Roxy, in the driveway of Plaintiff's home. Plaintiff contends that Roxy's death was part of "an epidemic of police killing pet dogs" in the City of Rochester ("City") and has sued Jones and the City (collectively "Defendants") for unlawful seizure in violation of the Fourth Amendment. (Dkt. 1).

Defendants have moved for summary judgment. (Dkt. 32). For the reasons below, Defendants' motion is denied.

## BACKGROUND

### I. Factual Background

As an initial matter, the Court notes that when they first filed their motion for summary judgment, Defendants failed to file a statement of materials facts as to which they contend there is no genuine issue to be tried, as required by Local Rule of Civil Procedure

56(a)(1). Realizing their error, Defendants contacted the Court and requested leave to supplement their motion papers with such a statement, and the Court allowed them to do so. (*See* Dkt. 38). Defendants filed their Statement of Undisputed Facts on September 15, 2023. (Dkt. 39-2).

Plaintiff's counsel seemingly overlooked the Court's grant of Defendants' request to file the Statement of Undisputed Facts and the subsequent filing thereof, and has argued that the Court should deny Defendants' motion for failure to comply with Local Rule 56(a)(1). (*See* Dkt. 57 at 12-13). Plaintiff also—presumably for the same reason—did not file a "response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs," as required by Local Rule 56(a)(2). Defendants therefore urge the Court to "exercise its discretion and deem the Defendants' Statement of Undisputed Facts as undisputed for this motion." (Dkt. 59 at 5).

The Court is not inclined to resolve the instant motion on the basis of procedural errors for which both sides can fairly be apportioned blame (Defendants for having failed to file their Statement of Undisputed Facts with their original moving papers and Plaintiff for having failed to adequately review the docket and recognize that the Court had permitted Defendants to file their Statement of Undisputed Facts late). Instead, the Court has reviewed the evidence submitted by the parties, and has identified where Plaintiff has controverted the facts set forth in Defendants' Statement of Undisputed Facts. The Court sets forth its summary of the evidence of record below. The Court accepts for purposes of the instant motion Plaintiff's recitation of the events leading up to Roxy's death, because

the Court must, on a motion for summary judgment, view the evidence in the light most favorable to the non-moving party (here, Plaintiff).

During the relevant time period, Plaintiff lived at 629 Jay Street in the City, with his girlfriend and their three daughters, as well as Roxy. (Dkt. 42-1 at ¶ 2; Dkt. 42-3 at ¶ 2). Roxy was a friendly dog who had never attacked or bitten anyone. (Dkt. 42-3 at ¶ 31). She was beloved by Plaintiff's family and all of their friends and neighbors. (*Id.*).

Shortly before midnight on August 1, 2021, RPD officers Jones, Alexander Pierce ("Pierce"), and Anthony Mazurkiewicz ("Mazurkiewicz") approached Plaintiff and asked him about reports of gunshots. (Dkt. 42-1 at ¶ 3). Plaintiff told the officers that he did not know anything about a shooting and the officers left. (*Id.* at ¶ 4).

Plaintiff later found a bullet hole in the front wall of his bedroom and a bullet on his bed. (*Id.* at ¶ 5). He called 911 at approximately midnight on August 2, 2021, to report this information. (*Id.* at ¶ 6). Jones, Pierce, and Mazurkiewicz then arrived at Plaintiff's home to investigate. (*Id.* at ¶ 7).

Plaintiff led the officers through the side door into his home, to his bedroom where the bullet was located. (*Id.* at ¶ 8). Plaintiff has submitted a sworn declaration stating that while the officers were in his bedroom, Roxy was laying in her cage, which was located directly next to Plaintiff's bed, with the door open. (Dkt. 42-3 at ¶¶ 9-12). According to Plaintiff, it is not possible that the officers did not see Roxy when they were in his bedroom, due to her location relative to the bed and the bullet. (*Id.* at ¶ 13).

Plaintiff states that after the officers inspected the bullet inside his bedroom, he walked them back outside to his side porch, and that Roxy followed him and the officers.

(*Id*. at ¶¶ 14-15). Plaintiff spoke with Pierce and Mazurkiewicz on his side porch, while Roxy sat next to him. (*Id*. at ¶ 16). As Plaintiff spoke to Pierce and Mazurkiewicz, Jones walked down his driveway towards the front of the house. (*Id*.). At no time did any of the officers ask Plaintiff to secure Roxy in any way. (*Id*. at ¶ 18).

Pierce and Mazurkiewicz went to the back of the house to see if they could contact Plaintiff's upstairs neighbor. (*Id*. at ¶ 16). Several minutes later, Jones walked back up Plaintiff's driveway towards the side door, speaking loudly on his phone. (*Id*. at ¶ 19). Plaintiff was standing inside his house next to his open side door, and Roxy was calmly sitting next to him. (*Id*. at ¶ 20). Roxy noticed Jones walking up the driveway, got up, exited the side door, and went down the porch stairs to greet him. (*Id*. at ¶ 21). She did not bark or growl when she got up. (*Id*.). At no point did Plaintiff, who was standing just inside the doorway, hear Roxy bark or growl at Jones. (*Id*. at ¶ 23).

Plaintiff suddenly heard three gunshots. (*Id*. at ¶ 24). He exited his home, and Jones claimed that Roxy had attacked and bitten him. (*Id*. at ¶ 25). Roxy, who had been shot by Jones, ran into the house and into Plaintiff's bedroom, where she collapsed and bled out on the floor. (*Id*. at ¶ 30).

Jones has submitted a sworn declaration stating that he did not see a dog or any indication of a dog while he was in Plaintiff's house before shooting Roxy. (Dkt. 32-7 at ¶ 7). Jones states that while he was on the phone outside Plaintiff's house, he "heard a sound that [he] recognized as nails hitting the floor," looked up, and "saw a large dog, baring its teeth, and running at [him], and then it lept [sic] off the porch at [him]." (*Id*. at ¶ 10). Jones claims that he moved backwards to try to evade the dog, but that it pursued

him and bit him on the inside of his left thigh, near his knee. (*Id*. at ¶¶ 10-11). Jones then shot the dog three times, after which it "immediately ceased biting [him]." (*Id*. at ¶¶ 12-13).

Footage from Pierce's body worn camera (Dkt. 32-5) is in the record. The footage is fairly dark, and Pierce was not close to the porch. Further, there is no sound in the beginning portion of the video, so a viewer cannot tell when the first gunshot occurs or hear whether Roxy was growling or barking. Roxy is also only visible from the side as she exits the house, and so a viewer cannot see her face. What a viewer can observe is that Jones walks towards the side porch and Roxy runs outside and down the steps (she does not "leap" off the porch, but clearly goes down the steps). She runs towards Jones, wagging her tail, and Jones jumps backwards. Roxy continues to approach Jones, who moves away from the side porch into a darker area where he and Roxy are not visible. A few seconds later, the sound turns on, and Plaintiff can be heard screaming that Jones has shot Roxy.

## II. Procedural Background

Plaintiff commenced this action on November 21, 2022. (Dkt. 1). Defendants filed the instant motion for summary judgment on September 5, 2023, before the close of discovery. (Dkt. 32). As noted above, Defendants—with the Court's permission—filed their Statement of Undisputed facts on September 15, 2023. (Dkt. 38; Dkt. 39-2).

Plaintiff opposed Defendants' motion, arguing in part that he required additional discovery in order to adequately respond. (Dkt. 42). Defendants filed a reply. (Dkt. 52).

Discovery continued, and closed on July 5, 2024. (Dkt. 12). After the close of discovery, the Court allowed the parties to file supplemental briefs regarding the motion

for summary judgment, which were filed on August 29, 2024, and September 12, 2024. (Dkt. 56; Dkt. 57; Dkt. 58; Dkt. 59).

## DISCUSSION

### I. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, it finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "The moving party bears the burden of showing the absence of a genuine dispute as to any material fact[.]" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654

F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II. No Further Discovery is Needed

As an initial matter, the Court addresses Plaintiff's argument, made pursuant to Federal Rule of Civil Procedure 56(d), that Defendants' motion should be denied as premature. (*See* Dkt. 42 at 8). Rule 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). The Court will assume for the sake of argument that Plaintiff adequately demonstrated in the first instance that he could not present facts essential to justify his opposition to Defendants' motion at the time it was originally filed. Plaintiff was nevertheless able to continue taking discovery while the Court deferred its consideration of the pending motion, and was allowed to file supplemental opposition papers after discovery had closed. Plaintiff did not demonstrate in his supplemental

opposition papers that any additional discovery was necessary. Accordingly, the Court will not deny Defendants' motion on the basis of Rule 56(d).

## III. Genuine Issues of Material Fact Preclude Summary Judgment

The Court turns to the merits of Defendants' request for summary judgment. Defendants argue that a reasonable juror would be constrained to find that Jones acted reasonably when he shot and killed Roxy. (Dkt. 32-1 at 6-10). Alternatively, Defendants argue that Jones is entitled to qualified immunity, because it was objectively reasonable for him to believe that he was acting lawfully. (*Id*. at 10-11). And finally, Defendants argue that because there was no underlying constitutional violation, there can be no municipal liability. (*Id*. at 12). The Court considers each of these arguments below.

### A. Reasonableness of Jones' Actions

"The Fourth Amendment prohibits unreasonable searches and seizures." *United States v. Amerson*, 483 F.3d 73, 77 (2d Cir. 2007). "[T]he unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment." *Carroll v. Cnty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013). In assessing reasonableness, a court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion and determine whether the totality of the circumstances justified the particular sort of seizure." *Id*. (quotation and alterations omitted).

Killing a person's pet dog is "a severe intrusion given the emotional attachment between a dog and an owner." *Id*.; *see also Ray v. Roane*, 948 F.3d 222, 227 (4th Cir.

2020) ("private interests in dogs—and family pets especially—are highly significant since dogs have aptly been labeled Man's Best Friend, and certainly the bond between a dog owner and his pet can be strong and enduring" (quotations omitted)). As such, "when a dog is seized—and especially, as here, where it is killed, not merely injured or detained—the intrusion on the owner weighs heavily in favor of finding the seizure unreasonable[.]" *Matteson v. Hall*, No. 18-CV-6772, 2019 WL 2192502, at *7 (W.D.N.Y. May 21, 2019) (quotation omitted and collecting cases).

But on the other hand, ensuring officer safety is a significant governmental interest. *Carroll*, 712 F.3d at 651. Accordingly, "in some circumstances, it is reasonable for an officer to shoot a dog that he believes poses a threat to his safety or the safety of the community." *Id*. "Though an officer need not wait to be mauled or attacked before employing force in self-defense, the officer may not utilize deadly force against a dog unless there is an actual basis to believe that the dog posed an imminent threat." *Azurdia v. City of New York*, No. 18-CV-04189-ARR-PK, 2019 WL 1406647, at *8 (E.D.N.Y. Mar. 28, 2019) (quotation omitted). Relevant factors in ascertaining reasonableness include the context in which the officer encountered the dog, the dog's behavior and temperament, the dog's breed, whether the owner was available and willing to assert control over the dog, whether non-lethal means were available to control the dog, and whether there was time to find an alternative solution to control the dog. *See Matteson*, 2019 WL 2192502, at *8; *see also Strong v. Perrone*, No. 17-CV-6183-FPG, 2020 WL 1445877, at *3 (W.D.N.Y. Mar. 25, 2020).

Defendants argue that: "[b]ecause Officer Jones first learned about the dog as the dog ran out and launched itself out of the residence at him, Officer Jones did not have the opportunity to plan any response to an aggressive dog"; "Officer Jones nevertheless opted to first take non-lethal action: he backpedaled and jumped around, trying to get away from the dog"; and "[o]nly after the dog was actively biting and harming him did Officer Jones supplement his evasive movements with his firearm, in order to stop the dog's attack." (Dkt. 32-1 at 8-9). The problem with these arguments is that they take Jones' account of the incident as true, and they resolve disputed facts in the light most favorable to *Defendants*.

Start with the assertion that Jones first learned of Roxy's presence when she "ran out and launched [herself]" at Jones. (Dkt. 32-1 at 8). Plaintiff has sworn under penalty of perjury that Roxy was visible when Jones was in his bedroom—that Jones could not possibly have missed her presence. Plaintiff has further sworn under penalty of perjury that Roxy calmly followed him down from the bedroom and sat by his side while he spoke with the officers. The Court must assume that a jury would credit this testimony, and reasonably conclude that Jones is not being truthful when he claims not to have previously been aware of Roxy's presence. Further, the assertion that Roxy "launched" herself at Jones is a characterization, and not one that a reasonable juror would be required to accept. As noted above, in the body worn camera footage, a viewer can see Roxy run down the steps, and could easily reject the characterization of her actions as a "leap" or a "launch." Moreover, even if Jones was surprised, "being startled by [Roxy's] presence does not provide him with carte blanch." *Strong*, 2020 WL 1445877, at *6.

It is true that Officer Jones jumped away from Roxy when she approached him and that she continued to follow him, but that standing alone would not compel a juror to conclude that he acted reasonably. It is not the law that an officer may shoot a plaintiff's family dog for doing nothing more than approaching him.

That brings the Court to the heart of Defendants' argument—that Jones was justified in shooting Roxy because she attacked and bit him. Defendants argue that there is no "genuine dispute" that Roxy bit Jones before he shot her, because "Plaintiff's belief based on suboptimal observations do[es] overcome the physical, photographic, and testimonial evidence that Officer Jones was bitten by" Roxy. (Dkt. 32-1 at 9-10 (noting that "the incident occurred outside, in the middle of the night, while Officer Jones was moving and jumping around" (internal quotation marks omitted)). In other words, Defendants' position appears to be that unless Plaintiff can unequivocally testify that he had a clear, unobstructed view of the incident and saw that Roxy did not bite Jones before he shot her, a jury would have to accept Jones' testimony that this is what happened.

But that is not the law. A jury may make credibility determinations based on circumstantial evidence. *See Douglas v. Portuondo*, 232 F. Supp. 2d 106, 115 (S.D.N.Y. 2002) ("The determination of how much weight to accord eyewitness testimony given that witness' opportunity to observe the events at issue and in light of any circumstantial evidence that corroborates or refutes such testimony is a matter of credibility."). In this case, there is abundant circumstantial evidence from which a jury could decide not to credit Jones' testimony. *See Strong*, 2020 WL 1445877, at *4-5 ("As the only direct witness of Sheba's behavior in the moments before he shot her, Perrone's credibility is very important.

Courts may not make credibility determinations in ruling on a motion for summary judgment. . . . [A] reasonable jury could conclude that Perrone is mischaracterizing his interaction with Sheba and that she was not showing signs of aggression.").

There is Plaintiff's testimony that Roxy was a friendly dog who had never bitten or attacked anyone. *See id*. at *5 ("There is an abundance of testimony that Sheba was well behaved and non-aggressive. This evidence supports Strong's argument that Sheba did not behave aggressively when she encountered Perrone." (citations omitted)). There is Plaintiff's testimony that Roxy was behaving calmly before the shooting, and that she did not bark or growl when she got up to exit the door of the house. There is the body worn camera video, on which a viewer cannot see Roxy bite (or even visibly attempt to bite) Jones before the shooting. And there is the discrepancy between Plaintiff's testimony that Jones could not possibly have missed seeing Roxy in the bedroom, and Jones' claim that he was unaware of her presence. "A jury must examine these discrepancies regarding the critical moments leading up to [Jones'] shooting of [Roxy] and weigh the relative credibility of the witnesses." *Id*.

The Court acknowledges that Defendants have submitted photographs showing a small injury to the inside of Jones' thigh. (Dkt. 39-1). Although Defendants claim that these photographs unequivocally show a bite mark, the Court disagrees. While the injury could be a bite mark, it also could be a scratch from a dog's nails. Indeed, given the orientation of this mark on Jones' leg, it is somewhat difficult to envision how Roxy could have gotten her muzzle into the position necessary to make it with her teeth. And even if

these photographs were conclusive evidence of a bite, they certainly do not show that Roxy bit Jones *before* he shot her.

*Robinson v. Pezzat*, 818 F.3d 1 (D.C. Cir. 2016), which Defendants cite as supporting their position (*see* Dkt. 32-1 at 10), actually says otherwise. In *Robinson*, the D.C. Circuit reversed the district court's grant of summary judgment to a police officer who claimed that the plaintiff's dog had bitten her on the foot before she shot the dog. 818 F.3d at 8. The court explained that there was a genuine issue of material fact, because the plaintiff had testified that her dog was lying on the floor of the bathroom when the officer opened the door and did not get up until after the officer fired her gun. *Id*. at *10. As such, a jury could have inferred that the dog was lying on the bathroom floor when she was shot by the officer. *Id*. It was only as to a second officer—who it was undisputed shot the dog after she had bitten the first officer and run out of the bathroom—that the court affirmed the grant of summary judgment. *Id*. at 11-12. In other words, while the dog had indisputably bitten the first officer, because the bite could have occurred after the first officer shot at the dog, the first officer was not entitled to summary judgment. Similarly, a jury in this case could reasonably conclude that Roxy either did not bite Jones or that if she did, the bite did not occur before Jones shot her.

The reasonableness of a Fourth Amendment seizure is a fact-intensive inquiry, and Defendants' motion fails to address a number of factors that a jury could consider in making its assessment. Instead, Defendants' motion is premised almost entirely on the assertion that there is no genuine dispute that Roxy bit Jones before he shot her. Because

the Court disagrees with that assertion, for the reasons set forth above, Defendants' motion must be denied.

**B. Qualified Immunity**

Defendants argue in the alternative that Jones is entitled to qualified immunity. (*See* Dkt. 32-1 at 10-11). "Qualified immunity protects government officials from civil damages liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (quotation omitted). In determining whether a defendant is entitled to qualified immunity, the Court "must consider whether: (1) the official violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct." *Id*. (quotation and alterations omitted). The defendant claiming qualified immunity bears the burden of showing that he is entitled to it. *Bacon v. Phelps*, 961 F.3d 533, 542 (2d Cir. 2020).

Defendants argue that Jones is entitled to qualified immunity "because clearly established law does not prohibit shooting a dog that is biting the officer." (Dkt. 32-1 at 10-11). But as the Court has explained above, there is a genuine issue of material fact regarding whether Roxy was biting Jones when he shot her. Defendants' qualified immunity argument, like their merits argument, requires the Court to resolve credibility disputes in their favor. It accordingly also fails.

**C. Municipal Liability**

Finally, Defendants argue that the Court should grant summary judgment to the City. The sole argument advanced by Defendants on this issue is that there can be no

municipal liability without an underlying constitutional violation. (Dkt. 32-1 at 12). This argument fails, because the Court has determined that Plaintiff's claim against Jones must go to a jury. Thus, the City has not shown that it is entitled to summary judgment.

**CONCLUSION**

For the foregoing reasons, the Court denies Defendants' motion for summary judgment. (Dkt. 32).

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: September 20, 2024
Rochester, New York